UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, ex
rel. MIKE D. HENIG, and HENIG
FURS, INC.,

               Plaintiffs-Relators,

          – *against* –

AMAZON.COM, INC., and
AMAZON.COM SERVICES, LLC,

               Defendants.

**OPINION & ORDER**

19-cv-05673 (ER)

R<small>AMOS</small>, D.J.:

    Plaintiffs-Relators Mike D. Henig and Henig Furs, Inc. (collectively "Henig")

bring this action against Amazon.com, Inc. and Amazon.com Services, LLC (collectively

"Amazon"), alleging that Amazon conspired with foreign manufacturers and distributors

to import fur products into the United States for distribution and avoided the payment of

the required fees and tariffs in violation of the False Claims Act ("FCA"). Doc. 63

("Second Amended Complaint" or "SAC") ¶ 1.

    Before the Court is Amazon's motion to dismiss the SAC pursuant to Federal

Rules of Civil Procedure 12(b)(6), 8(a), and 9 (b). Doc. 70. For the reasons set forth

below, Amazon's motion to dismiss is GRANTED.

I.    **BACKGROUND**

    **A. Statutory Framework**

    United States law imposes several requirements for the import of certain animal

products, including products made from fur. SAC ¶ 14. Furs are required to be inspected

by the Fish and Wildlife Service ("FWS") prior to entry into the United States to ensure,

among other things, that they are free of disease and that they are not the product of

unlawful actions such as the poaching of endangered species. *Id.* ¶ 15. To facilitate these

inspections, federal law requires that all shipments containing furs enter through specific ports at which the FWS has inspection facilities. *Id.* ¶ 16.

With limited exceptions, fur importers are required to file with the FWS a "Declaration for Importation or Exportation of Fish or Wildlife" ("Form 3-177"). 50 C.F.R. § 14.61. Form 3-177 requires importers to disclose certain information, including the foreign exporter and the domestic importer of the product, the types of animals whose furs are included in the shipment, and any information regarding permits related to those animals. SAC ¶ 18. Importers can complete and file Form 3-177 online through the FWS website, or they can print and complete the Form and deliver it to the FWS inspection facility on arrival of the shipment in the United States. *Id.* ¶ 19. Importation through an FWS inspection facility also requires the payment of a mandatory, non-discretionary fee payable to the United States. During the time period relevant to this complaint, that fee varied from $92 to $110 per shipment. *Id.* ¶ 20.

Federal law also imposes tariffs and duties on products imported into the United States. *Id.* ¶ 21. These tariffs vary based on the country of origin and the type of product and are reflected on the Harmonized Tariff Schedule ("HTS"), which is published online by the United States International Trade Commission. *Id.* ¶ 22. For each combination of product and country of origin, the HTS specifies a percentage tariff applicable to the import of those goods. *Id.* ¶ 24. Certain products imported from China, including furs, are subjected to a significantly increased tariff. *Id.* ¶ 23. This percentage, multiplied by the dollar value of the goods, yields the total tariff due. *Id.* ¶ 24. Clothing articles made of fur are subject to a base tariff of 4%. HTS § 4303.10.00. *Id.* ¶ 25. Fur clothing items imported from China are subject to an additional tariff of 25%. *See* HTS § 9903.88.03; *id.* ¶ 26. Assessment of these tariffs is non-discretionary. SAC ¶ 27.

U.S. Customs and Border Protection ("CBP") administers the collection of tariffs and duties on imports and enforces violations of tariff obligations. *Id.* ¶ 28. To facilitate the collection of tariffs and duties, the law requires that the shipper attach a Customs

Declaration to the outside of the package. *Id.* ¶ 29. On the Customs Declaration, the shipper must disclose, among other information, the contents of the package in plain language, the applicable product code from the HTS, and the dollar value of the contents of the package. *Id.* Based on the Customs Declaration, the CBP determines the amount owed and requires the importer pay the tariff. *Id.* ¶ 30. The CBP relies on the contents of the Customs Declaration in assessing tariffs owed. *Id.* ¶ 31. The agency rarely physically inspects imports to determine if the Declaration is accurate. *Id.*

### B. Factual Background

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Henig attached excerpts of the Business Solutions Agreement ("BSA") and explanatory pages from Amazon's website about how Amazon's fulfillment services work to the first amended complaint. *See* Docs. 37-14, 37-22, 37-23, 37-24. However, the SAC did not include the attachments.[1]

### 1. Amazon's Practices

Amazon.com, Inc. is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business in the State of Washington. SAC ¶ 8. At the time the complaint was filed, it was the second largest publicly traded

---

[1] In adjudicating a motion to dismiss, a court may consider only the complaint, exhibits to the complaint, any statements or documents incorporated in it by reference, and documents integral to it. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). "To be incorporated by reference, the complaint must make a clear, definite[,] and substantial reference to the documents[.]" *Bill Diodato Photography L.L.C. v. Avon Products, Inc.*, No. 12 Civ. 847 (RWS), 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (citation omitted). And "[t]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Id.* (alteration in original) (citation omitted). Thus, where a document is partially quoted in a complaint, the Court may generally consider its full text. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies*, Inc. 75 F.3d 801, 808 (2d Cir. 1996). Further, "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original) (citation omitted). Finally, "documents appended to [a plaintiff's] original complaint [are] integral to, the Amended Complaint." *Cano v. SEIU Loc. 32BJ*, No. 19 Civ. 8810 (PAE) (KHP), 2021 WL 4480274, at *1 (S.D.N.Y. Sept. 30, 2021). Accordingly, the Court considers the BSA in full and the attachment of Amazon's fulfillment services in adjudicating the instant motion because they are incorporated by reference and are integral to the SAC. *See* Doc. 37-14, 37-22, 37-23, 37-24, 72-1.

company in the United States, with a market capitalization of more than $1.8 trillion, and the largest e-commerce company in the world. *Id.* It has business operations in all 50 states and the Southern District of New York. *Id.* Amazon.com Services LLC is a wholly owned subsidiary of Amazon.com, Inc. *Id.* ¶ 9. It markets, stores, sells, and delivers consumer products, including furs, through the Amazon.com website. It also operates warehouses and fulfillment centers throughout the United States to receive, process, and deliver products to consumers, and operates customer service centers to respond to customer complaints and requests. *Id.*

Non-parties, Atlas Air Worldwide, Inc., Atlas Air Inc., Southern Air Holdings, Inc., Polar Air Cargo Worldwide, Inc., ZTO Express (Cayman) Inc., ZTO International, Inc., Tongsen, Hhdress, Fur Story, Meefur, QUEENFUR, Furtalk, YR.Lover, and AmelieDress (collectively the "Non-parties"), are foreign, primarily Chinese corporations. *Id.* ¶ 10. The Non-parties manufacture fur products in China, transport furs to international shipping hubs, including to ports in the United States, and transfer furs from Unites States ports to Amazon's warehouses and distributions centers. *Id.* ¶ 32.

The BSA governed the business relationship between Amazon and the Non-parties. *See* Docs. 37-22, 37-23, 37-24. The BSA provided that the Non-party will "list [itself] as the importer/consignee and nominate a customs broker." Doc. 37-23 at 5. Additionally, the BSA stated that the Non-parties "are responsible for all costs incurred to ship" their products and "for payment of all customs, duties, taxes, and other charges." Doc. 71 at 11.

Additionally, Amazon's website explains that "[t]he importer of record is responsible for ensuring that the shipment is successfully imported into the destination country. Responsibilities include filing legally required documents and paying assessed import duties and taxes. It is important to note that Amazon, including the fulfillment centers, will not serve as the importer of record." Doc. 37-14 at 2.

The Non-parties allegedly systematically shipped furs to Amazon's warehouses and distribution centers in the United States without Form 3-177. SAC ¶ 35. The Non-parties also shipped fur products through ports other than FWS designated ports with FWS inspection facilities. *Id.* ¶ 36. The Non-parties prepared and attached false Customs Declarations to the packages containing the furs. *Id.* ¶ 40. Specifically, these Customs Declarations included false information regarding the products contained in the packages, identifying them as polyester or children's clothing rather than furs. *Id.* ¶ 41. This subjected the shipments to much lower tariffs than would otherwise apply to fur imports from China. *Id.* ¶ 42. The Customs Declarations also falsely reported the value of the shipments, substantially undervaluing the shipments. *Id.* ¶ 43. As a result of these false statements, the tariffs the CBP assessed the Non-parties were fraudulently reduced. *Id.* ¶ 44.

Each of the packages imported into the United States as described above was then delivered to an Amazon warehouse or distribution center. *Id.* ¶ 46. The packages included invoices reflecting the terms and prices necessary for Amazon to store, market, and sell the furs. *Id.* ¶ 48. The Non-parties set the prices for the furs at significantly below market value; prices that were commercially possible only by avoiding the FWS inspection fees and tariffs. *Id.*

Moreover, each package contained a packing slip that listed, among other things, the port at which the package entered the United States. *Id.* ¶ 53. The packing slips for many of these shipments indicated that they entered the United States at ports that were not among the FWS-designated ports. *Id.* ¶ 54.

Amazon did not reject the furs or return them to the senders. *Id.* ¶ 59. Instead, Amazon sold the furs to customers throughout the United States. *Id.* ¶ 60. Amazon also monitored and controlled all communications between the Non-parties and the United States customers by directing that all such communications take place through the online sales and messaging platform integrated into Amazon.com. *Id.* ¶ 61.

Between 2007 and April 1, 2024, Amazon and the Non-parties imported tens of thousands of shipments of furs in the manner described above, without paying the required inspection fees and tariffs.  *Id.* ¶ 32.  It is alleged that Amazon underpaid the required fees by hundreds of millions of dollars.  *Id.*

### 2.  *Henig's Transactions on Amazon*

Henig Furs, Inc. is a corporation organized under the laws of the State of Alabama with its principal place of business in Alabama.  *Id.* ¶ 6.  Henig Furs is a family-run business that imports and sells furs and fur items.  *Id.*  Mike D. Henig is the owner of Henig Furs.  *Id.* ¶ 7.

Henig conducted a series of transactions and communications with the Non-parties, many of which took place through the Amazon-controlled messaging service.  *Id.* ¶ 66.

On May 1, 2017, Henig purchased 10 mink furs through Amazon for a total of $899.90 from Hhdress, a Non-party Chinese company.  *Id.* ¶ 67.  Amazon shipped these furs to Henig.  *Id.*  The product code on the packing slip and Customs Declaration, of which Amazon was aware and which it sent to Henig, indicated that the shipment was for children's clothing, and the declared value for the package was $80.  *Id.*  By shipping the furs with a product code that did not require FWS inspection and a Customs Declaration with a value of less than 10% of the actual value, Hhdress avoided the payment of the FWS inspection fees and tariffs to the United States.  *Id.* ¶ 68.  Amazon sold the products to Henig as furs, collected payment for the furs, and shipped the furs to Henig.  *Id.* ¶ 69.

On May 15, 2017, Henig purchased mink furs from Fur Story, a Non-party Chinese company, through Amazon for a total of $866.97.  *Id.* ¶ 70.  Amazon shipped these furs to Henig.  *Id.*  The product code on the packing slip and Customs Declaration reflected that the shipment contained polyester garments with a value of $20.  *Id.*

On June 28, 2017, QUEENFUR, a Non-party, sent an email to Henig stating that QUEENFUR "tr[ies]. . . to write low value to your custom[sic] to avoid the duty, but we

can't promise you will avoide (sic) the duty every[]time." *Id.* ¶ 71. In another communication, QUEENFUR stated that it "usually write[s] value in $200-$300 to custom, about 30 pieces in one box … [because] we know uauallly (sic) one person in US receive products more than $800 in one time, your custom will charge them." *Id.* ¶ 72. QUEENFUR prepared a Customs Declaration for an order placed by Henig for $10,654, reflecting a value of only $244.50, and reported that the products were made out of polyester, thereby avoiding both tariff and the inspection fees. *Id.* ¶ 73. QUEENFUR affirmed to Henig that it used the same technique—consistently undervaluing furs and reporting them as other products—when it made large shipments to Amazon warehouses via FedEx and other common carriers. *Id.* ¶ 74.

On November 7, 2017, YR.Lover, a Non-party, sold a fur through Amazon for $999. *Id.* ¶ 75. On the Customs Declaration for that fur, however, YR.Lover reported the value as only $300. *Id.*

Henig alleges that Amazon sold and shipped furs that were mislabeled as other products so as to avoid the FWS inspection fees and undervalued them on Customs Declarations so as to avoid tariffs, at a minimum, on the following dates: October 17, 2017; July 3, 7, 11, 16, 17 and 18, 2018; May 13, 21 and 29, 2019; June 4, 2019; and June 27, 2023. *Id.* ¶¶ 76–77.

Henig alleges that Amazon's conduct as described above violated 31 U.S.C. §§ 3729 (a)(1)(C) and 3729(a)(1)(G) of the FCA because Amazon: (1) knew, deliberately ignored, or recklessly disregarded that the furs were imported into the United States with Customs Declarations and packing slips that falsely reported the nature and value of the products; (2) knowingly and improperly avoided an obligation to pay the Government tariffs and the FWS inspection fees by receiving and distributing furs that it knew were unlawfully imported into the United States; (3) conspired with the Non-parties by committing reverse false claims over the course of more than 15 years by importing and selling fur products that had unlawfully avoided the FWS inspection fees and tariffs; and

(4) committed seven overt acts, including:  (i) advertising the unlawfully imported fur products on its website, Amazon.com; (ii) processing sales of the unlawfully imported fur products to domestic customers; (iii) collecting payment for the unlawfully imported fur products from domestic customers; (iv) remitting payment for those products to the Non-parties; (v) monitoring and approving of all communications between itself, the Non-parties, freight handlers, and customers; (vi) handling customer service complaints regarding the unlawfully imported fur products; and (vii) processing returns for those products.  *Id.* ¶¶ 82–88.

Henig seeks:  (1) to award the United States damages equal to three times the amount of fees, tariffs and duties Amazon wrongfully deprived the United States of pursuant to 31 U.S.C. § 3729(a)(1); (2) the imposition of a civil penalty on Amazon of no less than $13,946 and no more than $27,894 for each violation of the FCA pursuant to 31 U.S.C. § 3729(a)(1) and the Civil Monetary Penalties Inflation Adjustments for 2024, 89 Fed. Reg. 9764; (3) an award to Henig of the maximum *qui tam* plaintiff award pursuant to 31 U.S.C. § 3730(d); and (4) attorney fees, costs, and disbursements.  SAC at 16.

### C.  Procedural History

Henig filed the instant lawsuit in the District of South Carolina on June 30, 2017.  Doc. 1.  On June 18, 2019, the case was transferred to this Court.  Doc. 19.  On September 8, 2023, the U.S. Department of Justice declined to intervene in Henig's claims.  Doc. 26.  On May 31, 2024, Amazon moved to dismiss SAC pursuant to Federal Rule of Civil Procedure 12(b)(6), 8 (a), and 9(b).  Doc. 70.  Amazon argues that Henig does not adequately allege a violation of the FCA or a valid conspiracy claim.  *Id.*

## II.    LEGAL STANDARD

### 1.  Rule 12(b)6 Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F.Supp.2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *Doe v. N.Y. Univ.*, 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

### 2. Rule 8(a) General Rules of Pleading

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (citing *Conley v. Gibson, 355 U.S. 41, 47)*. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. *Id.* Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. *Id.*

### 3. Rule 9(b) Heighted Pleading Standard

Where a plaintiff brings a cause of action that sounds in fraud, the complaint must satisfy the heightened pleading requirements of Rule 9(b) by stating the circumstances constituting fraud with particularity. *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 382–83 (S.D.N.Y. 2015). To allege a fraud, the complaint must "adduce specific facts supporting a strong inference of fraud." *See United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 82 (2d Cir. 2017). Specifically, Rule 9(b) requires a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *DiMuro v. Clinique Laboratories, LLC*, 572 Fed. App'x. 27, 30 (2d Cir. 2014) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014).

## III.    DISCUSSION

### A.  Reverse False Claims

The FCA imposes a civil penalty on a defendant who "knowingly makes, uses, or causes" a false record or statement "to be made or used."  31 U.S.C. § 3729(a)(1)(G). Henig alleges that:

> Amazon knows, deliberately ignores, or recklessly disregards that the furs were imported into the United States with Customs Declarations and packing slips that falsely report the nature of the products and falsely undervalue the products, Amazon causes to be made and used false records which are material to an obligation to pay FWS inspection fees and duties and tariffs to the Government . . . Amazon knowingly and improperly avoids an obligation to pay money to the Government in the form of tariffs and FWS inspection fees by receiving, storing, marketing, selling, distributing, and delivering furs that it knows were unlawfully imported into the United States without the payment of FWS inspection fees and without the payment of the full amount due for Customs tariffs and duties, or deliberately ignores or recklessly disregards the unlawfulness of the importation of the furs.

SAC ¶¶ 83–84.

### 1.  Knowledge

The FCA considers a person acts "knowingly" if he:  (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).

### a.  Actual Knowledge

The FCA does not require a proof of specific intent to defraud.  *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 522 (S.D.N.Y. 2013).  However, the FCA's scienter requirement is "rigorous."  *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 694 (S.D.N.Y. 2018).   "[U]nder Rule 9(b), the proponent of an [FCA] claim must allege facts that give rise to a *strong inference* of fraudulent intent."  *United States ex rel. Tessler v. City of New York*, 14 Civ. 6455, 2016 WL 7335654, at *5 (S.D.N.Y. Dec. 16, 2016), aff'd, 712 F. App'x 27 (2d Cir. 2017)

(emphasis in original).  A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 466 (S.D.N.Y. 2020).  "A generalized profit motive . . . does not create the requisite 'strong inference' of fraudulent intent."  *See, e.g., Jordan Miller & Assocs., Inc. v. E.S.I. Cases & Accessories, Inc.*, 20 Civ. 5165 (LTS) (BCM), 2021 WL 3726962, at *4 (S.D.N.Y. Aug. 20, 2021) (quoting *Colpitts v. Blue Diamond Growers*, 20 Civ. 2487 (JPC), 2021 WL 981455, at *13 (S.D.N.Y. Mar. 16, 2021)); *Newman v. Bayer Corp.*, 695 F. Supp. 3d 469, 486 (S.D.N.Y. 2023) ("[S]imply alleging a defendant's self-interested desire to increase sales does not give rise to an inference of fraudulent intent.").

Henig asserts that they sufficiently allege Amazon's actual knowledge of the false claims through circumstantial evidence.  Doc. 75 at 14–16.  Specifically, Henig alleges that:  (1) Amazon's profit motivation was shown by the repeated transactions between Amazon and the Non-parties to "unlawfully import furs into the United States, avoid the FWS inspection fees and tariffs owed to the United States for the import of those furs, and sell those furs for mutual profit"; and (2) Amazon had the opportunity to commit fraud because it did not reject the furs or return them to the Non-parties, but instead accepted delivery, sold the furs, and remitted a share of the payment to the Non-parties. *Id.* at 15; SAC ¶¶ 59–60, 64.  This is not sufficient to establish knowledge.  The allegations depict nothing more than a "generalized profit motive" that does not advance Henig's actual knowledge theory.  *See Jordan Miller & Assocs., Inc. v. E.S.I. Cases & Accessories, Inc.*, 2021 WL 3726962, at *4 ("[A] generalized profit motive . . . does not create the requisite 'strong inference' of fraudulent intent.").

b.  *Deliberate Ignorance*

Under the False Claims Act, deliberate ignorance "encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps

to confirm the statement's truth or falsity." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023).

Henig does not allege that Amazon's own statements were false, or provide any specific allegation that Amazon was conscious of a substantial risk that the Non-parties made false statements. Henig does not explain why Amazon had the duty to investigate whether any packages it received from a third-party sellers complied with import obligations. Amazon only receives packages after they are cleared from the customs. Additionally, the BSA and Amazon's website provide that the Non-parties, instead of Amazon, were the "importer[s] of record" and are solely responsible for "filing legally required documents and paying assessed import duties and taxes." Therefore, Henig does not sufficiently allege that Amazon acted in deliberate ignorance of the Non-parties' false statements.

*c.* *Reckless Disregard*

Henig alleges that they have provided circumstantial evidence to show Amazon's "reckless disregard for the truth." SAC ¶ 45–65; Doc. 75 at 17. Specifically, Henig asserts that:

(1) each package had an invoice indicating that the package contained furs but the package lacked a Form 3-177;

(2) the invoices set the furs "at prices that were significantly below market value and that were commercially possible only through avoidance of the substantial expenses of [the] FWS inspection fees and tariffs";

(3) each package contained a packing slip indicating that they entered the United States at ports that were not among the FWS designated ports;

(4) "in handling, repackaging, and shipping the furs to customers, Amazon . . . observed that the products lacked the labeling that U.S. law requires on furs" yet "still marketed and sold the products as furs";

(5) Amazon "did not reject the furs or return them to the senders" but instead "stored, marketed, sold, distributed, and delivered the furs to customers throughout the United States, collected payment for the furs from customers, and remitted a share of that payment to" the [Non-parties]; and

(6) Amazon also "monitor[ed] and control[led] all communications between the [Non-parties] and U.S. customers by directing that all such communications

>   take place through the online sales and messaging platform integrated into
>   Amazon.com."

SAC ¶ 45–65; Doc. 75 at 15.

In response, Amazon contends that:  (1) there is no legal requirement that Form 3-177 accompany each imported good after it has been cleared through a port, Doc. 71 at 25 n. 8.; (2) "unidentified Amazon warehouse employees handling countless products would [not] know the fair market value of . . . specific fur items," Doc. 76 at 9;[2] (3) furs may enter at non-FWS designated Customs ports, *id.*; and (4) Henig did not establish that the specific fur transactions they conducted on Amazon's website ever even passed through an Amazon warehouse.  Doc. 76 at 8.

Amazon is correct that Form 3-177 is not legally required to travel with shipments after the shipments clear customs.  *See* 50 C.F.R. §§ 14.81–14.81.  Furthermore, as Henig admits, Form 3-177 can be filed electronically.  SAC ¶19.  Accordingly, it cannot be inferred from the fact that a particular package did not contain a physical copy of Form 3-177 when it arrived at an Amazon warehouse, that the shipper failed to file a Form 3-177 with the FWS.

While it is true, as Amazon argues, that certain exceptions allow shippers to import furs at a non-FWS designated port if meant for scientific purposes, to minimize deterioration or loss, or to alleviate undue economic hardship, *id.*; §§ 14.12, 14.31–14.33, Amazon does not allege that the furs imported through non-FWS designated ports were subject to such exceptions.

While it is also true that Henig does not specifically allege that the transactions that they conducted on Amazon's website passed through an Amazon warehouse at some point,  SAC ¶¶ 66–79, the allegation is included in Henig's general description of the course of conduct between Amazon and the Non-parties ("Amazon stored, marketed, sold, distributed, and delivered the furs to customers throughout the United States,

---

[2] Whether the unspecified port employees of Amazon could have been expected to detect the fraud is a matter of fact that the Court does not consider at this juncture.  Doc. 71 at 19–20.

collected payment for the furs from customers, and remitted a share of that payment to [the Non-parties].").  *Id.* ¶ 60.

That being said, even assuming that the Non-parties provided false Customs Declarations, imported the furs through non-FWS designated ports, and that the furs eventually passed through Amazon's warehouse, these facts, even in combination, do not create a strong inference of Amazon's knowledge of the false claims.  Amazon contends that it is not plausible for them to know about the false claims as they received packages only *after* the packages had entered the U.S. and the importation process had been completed.  *See* SAC ¶ 39; Doc. 71 at 27.  Henig does not adequately explain, except in purely conclusory terms, how Amazon "knew facts or had access to information suggesting that their public statements were not accurate."  *In re Farfetch Ltd. Sec. Litig.*, 19 Civ. 08657 (AJN), 2021 WL 4461264, at *7 (S.D.N.Y. Sept. 29, 2021), aff'd sub nom. *IAM Nat'l Pension Fund v. Farfetch Ltd.*, 21 Civ. 2752, 2023 WL 2879304 (2d Cir. Apr. 11, 2023).

Regarding Henig's allegation that Amazon monitored and controlled the communications between the Non-parties and the U.S. customers, there are limits to the scope of liability for failure to adequately monitor the allegedly fraudulent behavior of others.  *Cf. Kasilingam v. Tilray, Inc.*, No. 20 Civ 3459 (PAC), 2023 WL 5352294, at *2 (S.D.N.Y. Aug. 21, 2023) (finding scienter when a defendant "failed to check information they had a duty to monitor"); *see Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (finding the failure of a non-fiduciary accounting firm to identify problems of the defendant's internal controls and accounting practices was not reckless).  In *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, the Second Circuit dismissed a "failure to monitor" allegation because the plaintiff did not "specifically identify any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements."  531 F.3d 190, 196 (2d Cir. 2008).  Here, Henig only cursorily alleges that Amazon "monitors and controls all communications between [the Non-parties] and U.S.

customers by directing that *all* such communications take place through the online sales and messaging platform integrated into Amazon.com." SAC ¶ 61 (emphasis added). Similar to *Dynex Capital Inc.*, Henig fails to pinpoint to any specific false report or statement that would have reasonably prompted Amazon to investigate. Therefore, Henig does not adequately allege that Amazon failed to check information they had a duty to monitor.

    *2.   Causation*

    Even assuming that Henig adequately alleges that Amazon knew of the false claims, they fail to establish the causation element of § 3729(a)(1)(G).

    To survive a motion to dismiss when contending that a defendant caused a false claim to be submitted to the government, a relator must allege that the defendant's behavior was a "substantial factor in bringing about [the] filing" of a false claim and that the filing was "a normal consequence of the situation created by that scheme." *See United States ex rel. McSherry v. SLSCO, L.P.*, 18 Civ 5981 (ARR) (ST), 2024 WL 1934443, at *2 (E.D.N.Y. May 2, 2024). The "caused" submission of a false claim must be the "natural, ordinary and reasonable consequence of one's conduct." *See United States v. Spectrum Painting Corp.*, 19 Civ. 2096 (AT), 2020 WL 5026815, at *10 (S.D.N.Y. Aug. 25, 2020). Causation may be absent even if the allegations could "support an inference that the [defendant] was negligent." *United States ex rel. McSherry v. SLSCO, L.P.*, 2024 WL 1934443, at *2.

    Causation was determined to be plausibly alleged in *Spectrum Painting Corp.* because the complaint "allege[d] specific steps that [the defendant] took to circumvent the [r]egulations and hide the extent of [another defendant's] involvement, including by making misrepresentations in required forms." *Id.* However, causation is insufficiently alleged when it is asserted that the defendant was aware that the non-parties "have fallen short of their obligations, without accompanying allegations of proximate cause and foreseeability." *United States ex rel. McSherry v. SLSCO, L.P.*, 2024 WL 1934443, at *2.

16

This case is more similar to *McSherry* than *Spectrum Painting Corp.*  Henig does not allege that Amazon took any "specific steps to circumvent" the customs duty and hide the false claims made by the Non-parties.  Nor does Henig plausibly allege that the false claims would not have occurred but for Amazon's conduct, or that the Non-parties false claims were a "natural, ordinary and reasonable consequence of one's conduct."

Henig argues that "knowingly passing along false information" could be a basis for liability under the FCA as a substantial factor in causing a false claim to be presented. Doc. 75 at 13.  Henig relies on *United States ex rel. Taylor v. GMI USA Corp.*, which ruled against a defendant who "knowingly pass[ed] along false information supplied by the manufacturers, and thereby caused [the] customs broker to use the false information to complete the [f]orms[] that were then submitted to Customs."  714 F. Supp. 3d 275, 287 (S.D.N.Y. 2024).  *Taylor* is clearly distinguishable as there were clearly sufficient allegations of the defendants' knowing participation in FCA violations:

- The FAC in *Taylor* identified 11 misrepresentations made by the defendants in the footwear declarations, including four specific instances in which the defendants checked a box falsely characterizing the composition of the footwear after having previously chosen the correct category.  *Id.* at 282–3.

- The FAC in *Taylor* alleged that "on multiple occasions" the custom's broker specifically informed the defendants' employees, and the defendants' employees alerted the defendants, of the misclassification of footwear on entry documents.  *Id.* at 283.

- In *Taylor*, the inside whistleblower, an employee of the defendant, and co-conspirator Samsung which settled FCA claims brought by the federal government for over one million dollars, asserted that they imported footwear "in conjunction with" the defendants, and that the defendants provided the custom's brokers with footwear invoices that contained a wrong tariff classification.  *Id.* at 284, 288.

There are no such facts concerning Amazon's knowledge or direct involvement with the fraud here.  Consequently, based on the facts alleged, Henig has not plausibly alleged that Amazon "knowingly passed along false information."  If anything, the false

information that Amazon purportedly received and "passed along" was first presented by the Non-parties to the FWS and CBP.

Overall, Henig has not nudged their allegations over the line to plausible causality.

### 3. *Obligation*

To establish a qui tam claim a defendant must have an obligation—i.e. an "established duty" pursuant to 31 U.S.C. § 3729(b)(3) —to pay the government. *See Miller v. United States ex rel. Miller*, 110 F.4th 533, 544 (2d Cir. 2024).

Henig asserts that Amazon had an obligation to pay the government tariffs and FWS inspection fees for furs that it knew had been unlawfully imported into the United States. SAC ¶ 84. Amazon contends that because "the [BSA] and related guidance" specify, that the "importer of record," i.e. the Non-parties, were solely responsible for customs compliance, and that Amazon had no obligation to pay the government. Doc. 71 at 27–28. Amazon's argument stretches too far.[3]

In other words, Amazon was not exempt from the obligation to pay the government just because Amazon and the Non-parties agreed that the Non-parties were the sole "importer of record." As long as Amazon caused the Non-parties to present false record to the government to lower the customs duties over the fur, the duty exists. However, as discussed above, neither knowledge nor causation in Henig's complaints is sufficiently alleged.

Accordingly, Amazon's motion to dismiss the reverse false claims is granted.

---

[3] Even a non-importer of record can be liable for false information presented to the customs. *See United States ex rel. Taylor v. GMI USA Corp.*, 16 Civ. 7216 (RWL), 2024 WL 307791("Because Defendants were not the importer of record, they argue, they cannot be liable for false information presented in the Customs entry documents. Not so." The FCA is violated "not only by a person who makes a false statement or a false record . . . but also by one who engages in a fraudulent course of conduct that causes the government to lose money by honoring a false claim." *See United States ex rel. Taylor v. GMI USA Corp.*, 16 Civ. 7216 (RWL), 2024 WL 307791, at *8 (S.D.N.Y. Jan. 26, 2024) (citing *United States v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 445 (S.D.N.Y. 1999); *see also Tanner v. United States*, 483 U.S. 107, 129 (1987) ("the fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act").

**B. Conspiracy to Commit Reverse False Claims**

To state a conspiracy to commit reverse false claims pursuant to the FCA, a plaintiff must show:  (1) an unlawful agreement by the defendant to violate the FCA; and (2) at least one overt act performed in furtherance of that agreement.  *United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 19 Civ. 2501 (VM), 2021 WL 3620427, at *12 (S.D.N.Y. Aug. 13, 2021), aff'd sub nom. *Doe 1 v. EviCore Healthcare MSI, LLC*, 22 Civ. 530, 2023 WL 2249577 (2d Cir. Feb. 28, 2023).  General civil conspiracy principles apply to reverse false claims.  *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331 (S.D.N.Y. 2004).

To satisfy the first prong, the plaintiff has to allege that the defendant and the entity who submitted the false claim "agreed to defraud the government."  *United States ex rel. McSherry v. SLSCO, L.P.*, 18 Civ. 5981 (ARR) (SLT), 2023 WL 6050202, at *2 (E.D.N.Y. Sept. 15, 2023) (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 27 (2d Cir. 2016)); *see also United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2016) ("[I]t is not enough for relators to show there was an agreement that made it *likely* there would be a violation of the FCA; they must show an agreement was made in order to violate the FCA.").  Simply "plead[ing] a business relationship . . . and potential mutual financial gain from fraud" is not enough to establish an agreement to engage in alleged fraud.  *Bernstein v. Silverman*, 20 Civ. 630 (MAD) (CFH), 2024 WL 3595621, at *25 (N.D.N.Y. July 31, 2024).

The Court is cognizant that conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'"  *See United States ex rel. Taylor v. GMI USA Corp.*, 2024 WL 307791, at *8 (quoting *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)).  However, Henig fails to allege any facts plausibly suggesting an agreement or conspiracy beyond noting the existence of an ongoing business relationship between Amazon and the

Non-parties from which Amazon profited.  Doc. 75 at 24.  This is insufficient to infer a meeting of the minds to defraud the government.

To satisfy the overt act requirement, the plaintiff must allege facts indicating that an overt act was done in furtherance of an agreement to commit unlawful acts.  *See Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321 (S.D.N.Y. 2015), aff'd, 821 F.3d 349 (2d Cir. 2016).  Typically, an overt act is an affirmative act; mere inaction is insufficient.  *See Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, 17 Civ. 6334 (PGG), 2021 WL 4499084, at *24 (S.D.N.Y. Sept. 30, 2021), aff'd sub nom. *Kirschner as Tr. of Millennium Lender Claim Tr. v. JP Morgan Chase Bank, N.A.*, 21 Civ. 2726, 2023 WL 5439495 (2d Cir. Aug. 24, 2023).  The "[f]ailure to recognize or prevent fraud does not constitute an overt act."  *Heinert v. Bank of Am. N.A.*, 20 Civ. 0691, 2020 WL 6689287, at *4 (2d Cir. Nov. 13, 2020) (summary order) (affirming dismissal of civil conspiracy claim).

Henig asserts that Amazon committed seven overt acts, including:  (1) advertising the unlawfully imported fur products on its website, Amazon.com; (2) processing sales of the unlawfully imported fur products to the United States customers; (3) collecting payment for the unlawfully imported fur products from the United States customers; (4) remitting payment for those products to the Non-parties; (5) monitoring and approving of all communications between itself, the Non-parties, freight handlers, and customers; (6) handling customer service complaints regarding the unlawfully imported fur products; and (7) processing returns for those products.  SAC ¶¶ 82–88.  Other than the sixth allegation regarding handling customer service complaints for which Henig does not provide further details, Henig offers no facts beyond those already alleged in support of the reverse false claims.  Henig's "alleged overt acts in support of the conspiracy claim are essentially the same alleged acts that form the basis of" the previous claim.  *See* e.g., *Briarpatch Ltd., L.P.*, 2007 WL 1040809, at *26; *AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 21 Civ. 4550 (VSB) (RWL), 2024 WL 379952, at *18 ("[W]here the acts underlying

20

a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative.").  Therefore, Henig fails to allege an actionable conspiracy claim that is not "coextensive" with the reverse false claims.  *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 48 (E.D.N.Y. 2021), aff'd, 2022 WL 17818587 (2d Cir. Dec. 20, 2022) (dismissing the conspiracy claim that was "coextensive" with the preceding FCA claims that were insufficiently alleged).

Accordingly, Amazon's motion to dismiss the conspiracy to commit the reverse false claims is granted.

## IV.    CONCLUSION

For the foregoing reasons, Amazon's motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 70, 77.


It is SO ORDERED.


Dated: January 3, 2025
        New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.

21